UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JACKIE WARREN DEMIJOHN,

    Plaintiff,

v.                                                                  Civil No. 05-CV-10322-BC

COMMISSIONER OF                                  DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,                                   MAGISTRATE JUDGE CHARLES E. BINDER

    Defendant.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.     RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled.  Accordingly, IT IS RECOMMENDED that PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED, that the FINDINGS OF THE COMMISSIONER BE REVERSED, and the case REMANDED for an award of benefits.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case has been referred to this Magistrate Judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability

insurance benefits. This matter is currently before the Court on cross motions for summary judgment.

Plaintiff was 47 years of age at the time of the most recent administrative hearing and has completed high school and a college education. (Tr. at 271.) Plaintiff's relevant work history included approximately nine years of work as a counselor, three years as an emergency dispatcher, and three years of office work. (Tr. at 90, 272-73.)

Plaintiff filed the instant claim on November 12, 2002, alleging that she became unable to work on November 7, 2002. (Tr. at 46-48.) The claim was denied initially. (Tr. at 32.) In denying Plaintiff's claim, the Defendant Commissioner considered diabetes mellitus and retinal disorders as possible bases of disability. (*Id.*)

On February 2, 2005, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Thomas Walton, who considered the case *de novo*. In a decision dated June 22, 2005, the ALJ found that Plaintiff was not disabled. (Tr. at 15-26.) Plaintiff requested a review of this decision on June 25, 2005. (Tr. at 13.)

The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1-2, Tr. at 258-66), the Appeals Council, on December 2, 2005, denied Plaintiff's request for review. (Tr. at 6-9.) On December 15, 2005, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

---

[1]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

2

**B.     Standard of Review**

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam). The Commissioner is charged with finding the facts relevant to an application for disability benefits. A federal court "may not try the case de novo, . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The scope of the court's review is limited to an examination of the record only. *Brainard,* 889 F.2d at 681. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L. Ed. 2d 126 (1938)). The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts.'" *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility. *Garner,* 745 F.2d at 387-88.

**C.    Governing Law**

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen*, 800 F.2d at 537.

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

A claimant must meet all five parts of the test set forth in 20 C.F.R. § 404.1520 in order to receive disability benefits from Social Security. The test is as follows:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.
>
> Step Three: If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.
>
> Step Four: If the claimant is able to perform his or her previous work, benefits are denied without further analysis.
>
> Step Five: If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th

Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Preslar*, 14 F.3d at 1110. "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.* "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ." *Id.*

### D. Administrative Record

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that in May of 1995, Plaintiff went to the University of Michigan Medical Center requesting a pancreas transplant. She was 37 years of age at the time and reported having Type I diabetes since the age of 7. As a result of her diabetes, Plaintiff suffered with bilateral retinopathy,[2] peripheral neuropathic symptoms, early satiety,[3] and depression. She had also undergone laser treatment in her right eye. Plaintiff's request was denied. (Tr. at 254.) Further management of Plaintiff's diabetes was discussed. The doctor also prescribed medications "in hopes of controlling her bothersome neuropathy." (Tr. at 255.) Handwritten notes on this report indicate "severe neuropathy . . . she [Plaintiff] definitely can be considered a candidate for pancreas transplant." (*Id.*)

In November 1996, Plaintiff underwent biopsies of both breasts due to masses and thickening. Lab results showed fibrosis and chronic inflammation, but there was no malignancy. (Tr. at 235-36.)

---

[2] Retinopathy is described as "any disease of the retina, especially a noninflammatory disease marked by degeneration (wasting)." 5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE R-125.

[3] Satiety is described as "an uncomfortable feeling caused by over-gratification of a desire, especially with regard to food." 5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE S-33.

Plaintiff was seen by Dr. Jose Mari Jurado on January 26, 2001, for evaluation of her thumb which was losing strength. She reported that she had injured both shoulders in an automobile accident 20 years earlier and felt that the accident may be a cause of her problems. Physical examination revealed that range of motion in the neck was with pain, and shoulder range on the left side was 70-80% with pain. An EMG revealed abnormalities on the left. (Tr. at 120.) Dr. Jurado's findings revealed denervation in the left first dorsal interroseous muscle only. The doctor reported that a nerve conduction study found bilateral C6-7-8 radiculopathy, bilateral ulnar neuropathy with denervation along the left hand muscle, bilateral carpal tunnel syndrome, left radial neuropathy, and superimposing multifocal neuropathy from her diabetes. (Tr. at 122.)

A CT scan of the cervical spine conducted in February 2001 showed disc degenerative changes at the C6-7-T1 levels with a small central disc bulge/herniation at the C6-7 and moderate sized posterior right bone spur just below the disc space level. The doctor felt that an MRI of the cervical spine would be beneficial due to the metallic hardware seen in the Plaintiff's arm area. (Tr. at 233.)

On March 1, 2001, Plaintiff was seen by Dr. William Diefenbach for neurological consultation. Plaintiff's main complaint was chronic neck pain. The doctor described recent EMG nerve conduction studies as showing multi-level radiculopathy. (Tr. at 213.) The doctor reported that Plaintiff had undergone abdominal surgery a year ago, two surgeries for reattachment of her retinas, and islet cell transplantation surgery. (*Id.*) Plaintiff had limited range of motion of both shoulders secondary to painful range of motion at the elbows and wrists. The doctor reported that Plaintiff had evidence of cervical spondylosis[4] which was not severe. Deep tendon reflexes were

---

[4]Spondylosis is defined as "an abnormal fusion or growing together of two or more vertebrae." 5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE S-264.

7

symmetrical but diminished. (Tr. at 214.) Dr. Diefenbach did not feel that there was any need for neurosurgical intervention. He recommended that Plaintiff return to physical therapy with gentle therapy and massage. (*Id.*)

On March 13, 2001, Plaintiff was seen by Dr. El-Cid Tajon, M.D., for a follow-up examination. Plaintiff reported that she had blurred vision and that she was always nauseated. Plaintiff also reported numbness in the lower extremities secondary to neuropathy, some ankle swelling, and shooting pains in the right hand, extending all the way to the fingers and up to the elbow and shoulder. Plaintiff told the doctor that she has had diabetes for 36 years. (Tr. at 218.) Physical examination revealed slight swelling in the ankles, limited range of motion of the neck, and +2 deep tendon reflexes in all extremities. Joint examination showed limited range of motion particularly in the left shoulder. (Tr. at 220.) Dr. Tajon diagnosed diabetes mellitus type I, cervical spondylolysis, anxiety and depression, diabetic nephropathy, and diabetic retinopathy. (*Id.*)

Plaintiff was seen by Dr. Tajon on September 11, 2001, for follow up. Plaintiff reported still having pain in her neck and shoulder and said that she was told she had osteoarthritis and fibromyalgia. Plaintiff reported that she was seeing a rheumatologist and that she was also told she had carpal tunnel syndrome on the left side. Plaintiff also reported that she was continuing to see a foot doctor. Examination was normal, and Plaintiff was advised to return in six months. (Tr. at 150.)

On December 27, 2001, Dr. Mark Young, Podiatrist, wrote in a "To Whom It May Concern" letter that Plaintiff had had a recent problem with ulcerations on both feet, but that "she currently has no open ulcerations at this time." (Tr. at 129.)

8

On January 21, 2002, Plaintiff was seen by Dr. Carlos Diola at Valley Rheumatology Associates. The doctor reported that Plaintiff had flexor stenosing tenosynovitis[5] of both hands, generalized osteoarthritis, right shoulder myofascial pain, and fibromyalgia. Tenderness of tendons in both hands was seen. The doctor changed some of her medication and emphasized the importance of reconditioning exercises. (Tr. at 125.)

On February 28, 2002, Plaintiff was seen by Dr. Tajon for a follow-up examination. The doctor diagnosed diabetes, misalignment of the cervical vertebrae, osteoarthritis and fibromyalgia. Plaintiff was advised to continue her diet and exercise. She was prescribed OxyContin for her pain. (Tr. at 148-49.)

On April 8, 2002, Plaintiff saw Dr. Tajon and reported that she was having numbness of both hands, more so in the left hand, since December. She described a burning kind of numbness along with shoulder pain. Dr. Tajon felt that the bilateral hand numbness was probably due to the carpal tunnel syndrome, and she was advised to wear her wrist splints on both hands and to start taking Neurontin. The doctor also changed her depression medication. (Tr. at 147.)

Plaintiff had another follow-up examination on July 15, 2002, at which time she complained of right shoulder pains, neck pains, numbness in the upper extremities and in both feet, and neuropathy due to her diabetes. Plaintiff felt that the Neurontin was helping her by easing the pain and neuropathy. Upon examination, Plaintiff had definite limitations in the range of motion of the right shoulder. She was not able to raise her right arm above her head. The doctor advised Plaintiff to restart the Neurontin which she had stopped taking, continue the OxyContin for pain, and he increased her medication for depression. (Tr. at 146.)

---

[5]Tenosynovitis is defined as an "inflammation of the sheath or membrane which surrounds a tendon."
5 J. E. Schmidt, M.D., ATTORNEYS' DICTIONARY OF MEDICINE T-50.

Plaintiff was seen by Dr. Leslie Schutz of the Rehabilitation Associates of MidMichigan, on October 8, 2002, for evaluation of her chronic pain. Examination revealed that Plaintiff had significant loss of motion in internal and external rotation bilaterally in both shoulders. She had decreased muscle tone, weak hand grip, decreased sensation over the deltoid on the right and over the first web space in the left hand, diminished lower extremity reflexes, edema in the left ankle, decreased hair growth, and tenderness. Dr. Schutz recommended electrodiagnostic studies and increased the Neurontin. (Tr. at 131.)

On October 14, 2002, Plaintiff was seen by Dr. Tajon for follow up. Plaintiff's main complaints were of constant arm, neck and shoulder pain. She stated that all of her muscles in her upper extremities hurt and also from the knees down. She continued to have a problem with moving her right arm above her head, and she had numbness in her feet and upper extremities. Dr. Tajon continued Plaintiff on OxyContin, Paxil and her insulin pump. (Tr. at 145.)

Dr. Tajon examined Plaintiff on November 27, 2002, after being referred to him by Dr. Copeland for medical clearance prior to carpal tunnel surgery. Plaintiff complained of blurred vision with floaters, constant nausea, and continued neck, back and hand pain. Past medical history revealed that Plaintiff had a pancreatic islet cell transplantation as a possible cure for diabetes and two bone marrow transplants. According to the doctor, the transplant was rejected in February of 2000. Dr. Tajon reported that Plaintiff's medical history consisted of diabetic neuropathy, controlled since 1981, osteoarthritis in the right and left shoulders, a history of fibrocystic breasts, diabetic gastroparesis, reattachment of the stomach muscles, reattachment of the retina in the left eye twice, toxic shock syndrome, a plate in her left arm, pins and staples in the right shoulder, broken pelvic bone, broken right leg, broken right forearm, a history of hypertension and coronary artery disease. (Tr. at 142-43.) Dr. Tajon granted medical clearance

10

for Plaintiff's carpal tunnel surgery.  (Tr. at 143.)  Plaintiff underwent left carpal tunnel surgery on December 2, 2002.  (Tr. at 140.)

Plaintiff was seen on several occasions between February and November of 2002 for foot care due to her diabetes.  The doctor noted that Plaintiff was a high risk diabetic with hard brittle nails.  Plaintiff's nails needed to be debrided and watched for infection.  (Tr. at 126-27.)

Plaintiff was seen by Dr. Tajon on January 13, 2003, for follow-up.  Plaintiff reported feeling somewhat better since switching from Paxil to Wellbutrin.  However, she reported some episodes of hypoglycemia when exercising.  Plaintiff's insulin had been decreased, and her OxyContin was increased, which she reported was giving her some relief.  Plaintiff reported having had recent right carpal tunnel surgery.  She was no longer experiencing nausea.  Plaintiff was advised to reduce her baseline insulin dose.  (Tr. at 41.)

On March 4, 2003, Plaintiff underwent a psychological evaluation conducted at the request of the Disability Determination Service by George F. Ronan, Ph.D.  Plaintiff recounted that she did yoga, used a treadmill and hiked on her property.  (Tr. at 173.)  Dr. Ronan found Plaintiff in contact with reality, and described her speech as spontaneous and organized.  (Tr. at 174.) Plaintiff denied any hallucinations, delusions or obsessions.  (*Id.*)  Plaintiff described no recent suicidal ideas. Plaintiff's emotional reactions were described as "varied."  (*Id.*)  Plaintiff was diagnosed with a dysthymic[6] disorder, personality disorder, Type I diabetes, retinopathy, gastroparesis,[7]

---

[6]Dysthymia is defined as "a disorder of the mood, less severe than a major depression.  It is marked by loss of interest in activities previously enjoyed."  2 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE D-171.

[7]Gastroparesis is described as "a mild paralysis of the stomach."  3 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE G-42.

neuropathy, kidney problems, carpal tunnel syndrome, and broken bones. She was given a GAF[8] score of 65. (Tr. at 175-76.)

On April 29, 2003, Plaintiff reported that her blood sugars were erratic after receiving injections in her neck and shoulder area. She reported seeing flashing lights when her sugar dropped again. Plaintiff reported episodes of dizziness and equilibrium problems after being switched to Serzone, however, she said that those problems had resolved. She reported that her vision was bad and that she could not drive her stick shift car due to shoulder pain. Plaintiff was advised to see an eye doctor for her vision problems and was referred to a gynecologist for menopausal problems. Otherwise, her medications were continued. (Tr. at 197.)

On February 10, 2004, Plaintiff was seen by Dr. Mark Goethe for evaluation and treatment of her right shoulder. Dr. Goethe reported that Plaintiff had global loss of motion of the right shoulder, which is most severe in straight abduction, and internal rotation showed that she could get her thumb to the midlumbar level. Plaintiff's neck motion revealed good rotation with some restrictions in flexion and extension. Dr. Goethe suggested that he could do a shoulder

---

[8]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact and in predicting outcome. The reporting of overall [psychological, social, and occupational] functioning on Axis V can be done using the Global Assessment of Functioning (GAF) Scale." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000). A GAF Scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships; a scale of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers); a scale of 41-50 indicates serious symptoms e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a scale of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

replacement, but he was not sure that it would eliminate the pain in her neck, scapular region and upper back. The doctor explained the risks of surgery and stated that he needed more diagnostic studies before going any further. (Tr. at 249-50.)

On February 19, 2004, Plaintiff underwent a right shoulder arthrogram. A large bone spur was noted at the inferior margin of the humeral head. Smaller bone spurs were noted elsewhere. Evidence of the surgical repair of broken shoulder bones was seen. Degenerative changes were found without evidence of complete rotator cuff tear. (Tr. at 224.)

In a "To Whom It May Concern" letter, dated February 23, 2004, Dr. Tajon wrote:

> Jackie Demijohn has been my patient for the last three years. She has a history of several medical problems, including diabetes mellitus type 1, for which she had pancreatic islet cell transplantation in 1998 and also bone marrow transplantation and eventual rejection in February 2000 and is currently now on an insulin pump. She has a history of cervical spondylosis, diabetes retinopathy, gastropathy, and neuropathy. She also has a history of osteoarthritis, fibromyalgia, depression, and also carpal tunnel syndrome on both hands. The patient has multiple joint pains in the right shoulder and numbness in both upper extremities and pains in the neck area and legs, as well as the back. The patient is on multiple medications, which include narcotics, like morphine sulfate and OxyContin. The patient likewise is taking Paxil for her depression and is on an insulin pump for her diabetes. Because of these multiple medical problems and multiple joint pains and several medications that she is on. the patient is currently disabled and is not able to work.

(Tr. at 222.)

Plaintiff returned to Dr. Goethe on April 15, 2004, for re-evaluation and review of the diagnostic studies. Plaintiff reported that her shoulder was getting progressively stiffer. Dr. Goethe explained that he could not guarantee that shoulder surgery would be of assistance, and he suggested that she get a second opinion and recommended she consult another physician. (Tr. at 248.)

On January 18, 2005, Dr. Shokoohi wrote a letter to Plaintiff summarizing the status of her eye health. Plaintiff's vision was measured as 20/25 in the right eye and 20/30 in the left eye. The

13

corneas of both eyes were found to be clear. The doctor stated that Plaintiff's eyes were "stable and doing quite well" at this time. He stated that she could perform daily activities with no limitations. (Tr. at 251.)

Approximately one week prior to the administrative hearing, in a letter to Plaintiff's attorney, dated January 26, 2005, Dr. Tajon wrote:

> This letter is an update on my patient, Jackie Demijohn. Up to this point, the patient is considered permanently disabled. She has still had problems with control of her blood sugar where she had erratic levels, sometimes low enough that she loses consciousness. As you know, she has a history of diabetes mellitus type 1, and she is on an insulin pump. Likewise, she still has a lot of joint pain, like right wrist joint pain and numbness of the thumb on the right side. She still has anxiety attacks from her history of depression. She has chronic right shoulder pain and also a history of cervical spondylosis, carpal tunnel syndrome, diabetic retinopathy, and neuropathy. She has limitation in the right shoulder range of motion. She is on narcotic medications, including OxyContin. It is due to all of these problems going on with the patient right now that she is rendered permanently disabled and is unable to work.

(Tr. at 247.)

At the administrative hearing, a (VE) testified. He characterized Plaintiff's prior counseling work to be primarily sedentary in nature with the occasional performance of light exertion tasks. (Tr. at 301.) Plaintiff's prior work as a 911 dispatcher was described as semi-skilled and sedentary. (*Id.*) In response to a hypothetical question presuming a person of Plaintiff's circumstances who was able to undertake a restricted range of light work involving the lifting of no greater than 15 pounds, no overhead work with the right hand, and which involved unskilled low stress tasks not done in proximity to moving machinery, the VE identified 18,000 unskilled restaurant hostess, office clerk and operator positions consistent with these hypothetical conditions. (Tr. at 301-02.) When asked to presume that Plaintiff's testimony was "credible and supported by

the medical evidence" the VE opined that such a person could not undertake any of the jobs he had identified on a full-time basis. (Tr. at 302.)

### E. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since the onset of her disability. (Tr. at 25.) At step two, the ALJ found that Plaintiff's diabetes, retinopathy, neuropathy, and carpal tunnel syndrome were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (*Id.*) At step five, the ALJ denied Plaintiff benefits because Plaintiff could perform a significant number of jobs available in the national economy. (Tr. at 26.)

Using the Commissioner's grid rules as a guide, the ALJ found that:

> . . . there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a general office clerk, hostess and collator operator. He also testified there are a total of 18,000 of these positions in the relevant region, which he defined as the lower peninsula of Michigan.

(*Id.*)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that Plaintiff possessed the residual functional capacity to return to a limited range of light work. (*Id.*)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling

> of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

**2.    Substantial Evidence**

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

I first suggest that as to Plaintiff's claims of disabling mental impairment, substantial evidence supports the findings of the ALJ. As to Plaintiff's claims of disabling physical impairments, counsel for Plaintiff argues that the ALJ erred when he found that Plaintiff's condition failed to meet or equal any of the Commissioner's Listings. Specifically, counsel argues that Plaintiff's condition meets or equals Listing 9.08, which deals with diabetes and directs a finding of disability in cases where: "neuropathy [is] demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dextrose movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 9.08A. "Persistent disorganization of motor function" is defined as "paresis or paralysis, tremor or other

16

involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in combinations." 20 C.F.R. Pt. 404, Subpt P, App. 1, § 11.00C. The listings also state that "the assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." *Id.*

On this record, I suggest that the ALJ committed error when he concluded that Plaintiff's condition failed to meet this listed impairment. First, there is no dispute on this record that the Plaintiff has been diagnosed with diabetes and suffers from the effects of that disease. Furthermore, the medical evidence of record consistently demonstrates diagnoses of neuropathy as demonstrated by abnormal diagnostic tests, along with persistent findings of diminished reflexes, numbness, and diminished range of motion, particularly in the shoulders and hands. (Tr. at 120, 122, 233, 213, 214, 220, 125, 146, 131, 145, 142-43, 224, 222, 247.) This pattern, I suggest, meets or equals the conditions required for disability set forth in the listings quoted above. In the alternative, I suggest that these findings fatally undercut the residual functional capacity assessment made by the ALJ. Nor does the fact that Plaintiff told the Commissioner's examining psychologist that she undertook leisure activities such as yoga and walking on a treadmill or on her property (Tr. at 173) support a finding that Plaintiff is not disabled. *Yawitz v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967); *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981). "These tasks can be performed intermittently . . . and do not require the sustained effort necessary for any substantial, sustained and regular employment." *Fulwood v. Heckler*, 594 F.Supp. 540, 543 (D.Me. 1984).

The ALJ did not find Plaintiff's allegations of disabling pain fully credible. In *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365 (6th Cir. 1991), the Sixth Circuit found that:

17

> . . . our evaluation of subjective complaints of disabling pain is two-pronged. We must determine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine:
>
> > 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or,
> >
> > 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 1369 (*citing Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (*citing Duncan*). On this record, I suggest that the ALJ improperly discredited Plaintiff's testimony. Plaintiff's testimony describing her medical condition, and the resulting physical limitations (Tr. at 273–291), is, I conclude, fully consistent with both these legal standards, and with the objective medical evidence described above. Therefore, the ALJ's failure to give this testimony the veracity it deserved was, I suggest, error.

Nor can the VE's testimony provide support for the ALJ's findings, particularly in light of his unequivocal statement that presuming the veracity of Plaintiff's testimony, she would be unable to undertake any substantial gainful employment. (Tr. at 302.) I further suggest that the ALJ's hypothetical questions failed to meet the standards set forth in this circuit and therefore cannot constitute substantial evidentiary support for the ALJ's findings. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. In this

circuit, the latter option requires that the "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking[,]" *Mowery v. Heckler* 771 F.2d 966, 973 (6th Cir. 1985); or that "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits[.]" *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Because I conclude that these conditions have been met, I suggest that this case be remanded for an award of benefits.

### III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n. of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                     s/ *Charles E Binder*
                                       CHARLES E. BINDER
Dated: July 12, 2006               United States Magistrate Judge


### **CERTIFICATION**

     I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on James A. Brunson and John F. O'Grady, and served in the traditional manner on Honorable David M. Lawson.


Dated:  July 12, 2006                         By     s/Mary E. Dobbick
                                                                       Secretary to Magistrate Judge Binder